2026 IL App (4th) 250295

NO. 4-25-0295

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 10, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| BRANDON TAYLOR, | ) | |
| Defendant-Appellant. | ) | No. 21CF961 |
| | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices Zenoff and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        In May 2021, defendant, Brandon Taylor, was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)). The charges generally alleged that on October 8, 2020, defendant, Dory Delmar Love, Nakeithian Cortez Johnson, and Thomas Hawkins shot and killed Tammy Gonzalez during the commission of a forcible felony—namely, home invasion (*id.* § 19-6(a)). The charges further alleged defendant was armed with a firearm during these crimes.

¶ 2        In February 2023, the trial court conducted defendant's jury trial, and the jury found defendant guilty of first degree murder. The court later sentenced defendant to 57 years in prison.

¶ 3        Defendant appeals, arguing that (1) the trial testimony by the State's DNA expert lacked a proper foundation for her conclusion that one of the two male DNA profiles found on a cigarette butt at the crime scene matched defendant's DNA profile, (2) the State's evidence was

not sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt, and (3) defendant's 57-year sentence was excessive.

¶ 4 We disagree with all of defendant's claims and affirm.

¶ 5 I. BACKGROUND

¶ 6 A. The Charges

¶ 7 In May 2021, the State initially charged defendant with first degree murder in a criminal complaint (*id.* § 9-1(a)(1)). In July 2021, a grand jury indicted defendant, along with codefendants Dory Delmar Love and Nakeithian Cortez Johnson, on the charge of first degree murder. The charges generally alleged that on October 8, 2020, defendant, his codefendants, and Thomas Hawkins shot and killed Tammy Gonzalez during the commission of a forcible felony—namely, home invasion (*id.* § 19-6(a)). The indictment further alleged defendant was armed with a firearm during the commission of the home invasion.

¶ 8 B. The Jury Trial

¶ 9 In February 2023, the trial court conducted defendant's jury trial, and the State presented the following evidence.

¶ 10 1. *Ashley McCammond*

¶ 11 Ashley McCammond testified that on October 8, 2020, she resided with her boyfriend, Adan Ibarra, in their home at 1307 15th Avenue, in Rockford, Illinois. During the early morning hours of October 8, 2020, McCammond and Ibarra were asleep in their bedroom when three men wearing ski masks with eye and mouth cutouts forced entry into their home. Upon entering McCammond's bedroom, the intruders announced they were police officers, and then one intruder immediately struck McCammond in the face with a revolver and ordered her to lie flat on the bed. Another intruder struck Ibarra in the back of the head with a handgun.

- 2 -

McCammond observed that at least two of the men were armed, specifically noting a revolver and a 9-millimeter handgun.

¶ 12        The intruders then ransacked the house, searching for drugs and money, and used their weapons to strike McCammond and Ibarra. McCammond was struck again on her eyebrow. At some point, one of the intruders poured hot candle wax on McCammond and then struck her on the right side of her face with the candleholder. McCammond was facedown and was hit multiple times. That same intruder shoved an object into Ibarra's rectum and threatened to rape McCammond if Ibarra did not reveal where the drugs were located.

¶ 13        McCammond testified that one of the intruders asked Ibarra for a cigarette. After Ibarra told the men where the cigarettes were located, the intruder smoked one and then shared it with Ibarra.

¶ 14        The intruders eventually moved McCammond and Ibarra to the living room. They tied up McCammond with an extension cord and ordered her not to look at them. When McCammond called one of the men a derogatory name, the intruders mistakenly believed Ibarra made the comment and repeatedly stomped on his back.

¶ 15        The intruders stole numerous items, including clothing, two televisions, a PlayStation, DVDs, jewelry, McCammond's purse, and the cremated ashes of her sister and her dog. They also poured bleach on her clothing (ostensibly to destroy any possible DNA evidence).

¶ 16        Because the men failed to find a satisfactory amount of drugs, they held Ibarra at gunpoint and forced him to text his drug supplier to come over. (The trial evidence identified the supplier as Roger Garcia Fiebrantz, Gonzalez's son.) The intruders also took McCammond's cell phone, after forcing her to provide the passcode.

¶ 17        After Ibarra contacted Fiebrantz, two of the intruders walked McCammond out to

the detached garage, seated her in a chair, and covered her with a sheet. One intruder remained inside the house with Ibarra while he cleaned blood from his face. The two men in the garage eventually exited to the driveway.

¶ 18       McCammond testified that shortly thereafter, she heard a vehicle pull into the driveway, heard "Tammy *** [say] something" (the record is unclear how McCammond knew Gonzalez's voice), and then heard "tires squeal out backward," immediately followed by a single gunshot. After the intruders fled the scene, McCammond went back inside, got dressed, and walked to a nearby police station with Ibarra to report the incident. As a result of the attack, McCammond suffered black eyes, a swollen face and nose, and a bruise by her right ear.

¶ 19       Regarding the subsequent investigation, McCammond testified that in February 2021, officers asked her to view photo lineups and she successfully identified Johnson as one of the intruders. She also testified that she had known Love for a few years and had spoken with him shortly before October 8, 2020, when she was driving home from work. During that conversation, she told Love that she lived in a nearby apartment.

¶ 20                     2. *Roger Garcia Fiebrantz*

¶ 21       Roger Garcia Fiebrantz testified he was the son of Gonzalez. Fiebrantz testified he could not remember the events of October 8, 2020, because "it was a traumatizing situation" and he had "been shot in the head" in an unrelated incident. The State asked Fiebrantz a series of questions regarding the incident. Specifically, the State asked if Fiebrantz recalled (1) Ibarra calling him to collect $200, (2) asking his mother to drive him to Ibarra's house, and (3) a man putting a gun in his face when they pulled into the garage. The State further asked if Fiebrantz recalled his mother trying to save him, the man threatening to shoot, and his mother stating she was hit and could not breathe. Fiebrantz testified he did not recall any of those events.

¶ 22 Because Fiebrantz claimed a complete lack of memory on the witness stand, the State introduced and published his video-recorded statement to the police, which was recorded the morning of the shooting. Fiebrantz acknowledged he was the person in the video but maintained he had no independent recollection of the statements he made.

¶ 23 In the video, Fiebrantz told the police that he went to Ibarra's house around 4:30 or 5 a.m. Fiebrantz explained that he was at his house and called his mother for a ride. At his request, Gonzalez drove Fiebrantz to Ibarra's house and pulled into the driveway.

¶ 24 When they arrived, Ibarra came out of the house, approached the car's window, and handed Fiebrantz $200. Suddenly, a tall, skinny, dark-skinned Black man, wearing a face mask, emerged and approached the passenger seat. The man pointed a gun directly in Fiebrantz's face, waved the firearm around, and threatened to shoot. In response, Fiebrantz attempted to give the man everything he had on him, including the $200 he had just received.

¶ 25 Fiebrantz stated his mother tried to "save him." As the man fired his weapon, Gonzalez threw the car in reverse and attempted to drive away. Fiebrantz recalled hearing what he believed were two shots. Gonzalez then told him that she had been hit and could not breathe. Fiebrantz initially told her they needed to go to the hospital, thinking she was still able to drive. However, he quickly realized he had to take over the wheel because she was swerving toward the shoulder of the road. He then drove them to the hospital.

¶ 26                                    3. *Thomas Hawkins*

¶ 27 Thomas Hawkins testified that he was currently in federal custody for two charges of robbery and was on federal probation in October 2020, after serving a 136-month prison sentence for a 2008 conviction for interference with commerce by threat of violence. Hawkins acknowledged he faced the possibility of additional penalties on his federal probation due to his

involvement in the present case. However, he testified that in April 2021, he entered into a written agreement with both state and federal authorities, under which he received full immunity from prosecution for his role in the October 2020 home invasion and murder in exchange for his truthful testimony.

¶ 28 Regarding the events of October 8, 2020, Hawkins testified that late the night before, he met with (1) Dory Love, (2) a man he knew as Bo Lord, and (3) a man he knew as "Lil B" at the apartment of Love's girlfriend on 15th Avenue. Hawkins noted that he had known Love his entire life, had known Lord for approximately a month through the mother of Hawkins's child, and had just met Lil B that night. Hawkins initially believed Lil B's name was Brandon Lambert, based on information from Love, but he later learned it was Brandon Taylor. At trial, Hawkins identified defendant as the man he knew as Lil B.

¶ 29 Hawkins testified that Love organized a plan to rob a house located a block and a half away because he believed drugs were inside. On October 8, 2020, Hawkins drove his truck to the alley behind the targeted house. Because Love knew the residents and did not want his face seen, he remained inside the truck. Hawkins, Lord, and defendant exited the vehicle, wearing black gloves and ski masks that exposed only their eyes and mouths. Lord was armed with a 9-millimeter Glock 19, and defendant was armed with a 9-millimeter handgun.

¶ 30 Hawkins testified that he and Lord helped defendant enter the house through a side window and then Lord stood on Hawkins's shoulders to climb inside. Lord and defendant then unlocked the front door to let Hawkins in. Upon entering during the early morning hours, Hawkins heard screaming from a man and a woman in the bedroom. The intruders ordered the couple to stay on the bed. Defendant smacked the man in the head with his gun and poured a liquid over the woman's face.

¶ 31    The men then ransacked the house looking for drugs and money, ultimately finding approximately 14 grams of cocaine. Hawkins testified that he temporarily held Lord's handgun while Lord carried stolen items, including televisions, electronics, jewelry, and a pit bull puppy, out to Hawkins's vehicle.

¶ 32    Because the intruders did not find as much money or drugs as they expected, they moved the couple into the living room and tied them up with an orange extension cord. Hawkins testified that (1) he, Lord, and defendant all threatened to beat the man further if he did not comply with their demands and (2) defendant assaulted the man by inserting an object into his rectum. They demanded the man contact his drug supplier and lure him to the house so they could rob him. The man eventually texted his supplier, who agreed to come over.

¶ 33    While waiting, Lord poured bleach throughout the house in an attempt to destroy DNA evidence. The men then formed an ambush plan. Defendant remained inside the house with the male resident, while Hawkins, Lord, and the female resident went into the detached garage. The plan was for defendant to allow the male resident to walk out to the supplier's vehicle, at which point Hawkins and Lord would emerge from the garage to commit the robbery. Because he did not have a gun, Hawkins retrieved a green crowbar from his truck and concealed it in his sweater sleeve.

¶ 34    When the supplier's vehicle arrived, the male resident walked toward the passenger side, prompting Hawkins and Lord to exit the garage. Hawkins approached the driver's side and attempted to smash the window with the crowbar, but the glass did not break. He then heard Lord tussling with someone on the passenger side. Lord ran to the front of the vehicle and yelled that an occupant had a gun, though Hawkins testified he never saw a firearm. Lord then fired a single shot into the vehicle. The vehicle slowly reversed before going into drive and speeding away.

¶ 35       Hawkins, Lord, and defendant then ran back to Hawkins's truck and fled. Love drove the vehicle erratically and almost hit a light pole because he had been drinking in the truck during the home invasion. This prompted Hawkins to take over driving. He drove the group to his child's mother's house. Later that day, Hawkins saw a news alert on his phone, showing yellow police tape around the targeted house, and he realized someone had been killed.

¶ 36       Hawkins testified that the group subsequently disposed of the stolen items. Love had already taken it upon himself to hide some of the property behind a bus station and nearby factories. However, because Hawkins, Lord, and defendant objected to Love's being the only one who knew the location of these items, Hawkins, Lord, and defendant retrieved them to dispose of them together. Using bolt cutters, they cut a lock near the Rockford Register Star building and threw the televisions into the Rock River. They dumped the remaining items, including clothing and Lord's handgun, in a wooded area near "dead man's curve," which was located between the west and south sides of Rockford. Hawkins later sold one of the stolen cell phones at an automated kiosk at Walmart.

¶ 37       Regarding the police investigation, Hawkins testified that in February 2021, detectives approached him because they discovered he had sold the stolen phone. Afraid of getting in trouble, Hawkins did not disclose his involvement in the home invasion. Instead, in an attempt to gain favor, he provided Detective Fitzgerald with information regarding an unrelated murder.

¶ 38       In April 2021, after securing his immunity agreement, Hawkins provided a full statement detailing the home invasion. During this interview, the police officers showed Hawkins single photographs of Love and Lord, which he identified, labeled with their names, initialed, and dated. The officers also showed Hawkins a photo lineup containing an individual named Brandon Lambert, but Hawkins did not identify anyone.

¶ 39　　　　Later that month, police officers showed Hawkins a new photo lineup, and Hawkins identified defendant from this lineup and circled his photograph. Hawkins also provided the officers with the location where the group disposed of the evidence near "dead man's curve," which he identified on a map. This information led officers to recover all the items dumped there except for Lord's handgun.

¶ 40　　　　　　　　　　　4. *Law Enforcement Witnesses*

¶ 41　　　　In the early morning of October 8, 2020, Officer DaCoda VanVleet met with McCammond and transported her to the police station. VanVleet observed that McCammond had facial injuries and several white spots on her face and collar, which appeared to be dried candle wax.

¶ 42　　　　Another officer met with Fiebrantz at the hospital and transported him to the police station for questioning. Detective Fitzgerald later interviewed Fiebrantz with Detective Mace at the District 2 police building, and they recorded the interview.

¶ 43　　　　During the crime scene investigation at 1307 15th Avenue, Officer Andrew Thompson recovered a spent 9-millimeter Luger cartridge case outside the residence. Inside the home, officers recovered a smoked cigarette butt from the kitchen, which they submitted for DNA testing. Officers later obtained a buccal swab from defendant to allow the Illinois State Police Forensic Science Laboratory to compare his DNA to DNA found on the cigarette butt.

¶ 44　　　　As the investigation progressed, Fitzgerald developed multiple suspects. In February 2021, Fitzgerald compiled two photo lineups for McCammond to view. McCammond identified Johnson from one of the two photo lineups, circling his photograph and signing and dating the document.

¶ 45　　　　Fitzgerald also spoke with Hawkins once in February 2021 and twice in April 2021.

On April 7, 2021, Hawkins provided a recorded statement detailing the incident in the presence of Fitzgerald and attorneys for both Hawkins and the government. During this interview, Fitzgerald showed Hawkins single photographs of Love and Johnson, and Hawkins identified both men, writing their respective street names, "D Love" and "Bo Lord," on the photos.

¶ 46 Hawkins also provided information regarding the location where the intruders disposed of items from the home invasion. Fitzgerald showed Hawkins a satellite map of the area around Curve Street and South Avon Street on the southwest side of Rockford, and Hawkins pinpointed the exact location on the map. This information led police officers to recover the items from that location, and that map was admitted into evidence.

¶ 47 Also, during the April 7 interview, Hawkins stated that an individual named Brandon participated in the offense, indicating he believed the man's last name was Lambert. Based on this information, Fitzgerald created a photo lineup containing an individual named Brandon Lambert, but Hawkins did not identify anyone from that group.

¶ 48 Fitzgerald conducted further investigation and met with Hawkins again on April 15, 2021, with a new photo lineup that included defendant. Hawkins identified defendant from this lineup as a participant in the October 2020 home invasion and murder.

¶ 49 The forensic pathologist who conducted an autopsy on Gonzalez testified that she died of a single gunshot wound to the chest.

¶ 50                            5. *Heather May*

¶ 51 Heather May, a forensic scientist in the biology and DNA section of the Illinois State Police Forensic Science Laboratory in Rockford, testified, without objection, as an expert in forensic biology and DNA analysis. She stated her duties included conducting DNA testing on criminal evidence, interpreting results, and issuing reports. May had a bachelor's degree in

genetics from the University of Wisconsin-Madison and a master's degree in forensic science from the University of Illinois Chicago. She completed specialized training through the Illinois State Police, including practical, written, and oral examinations.

¶ 52        May explained that DNA is unique to every person, except identical siblings, and remains the same throughout a person's life and across all body tissues. Although red blood cells do not contain DNA, she noted analysts can still generate a DNA profile from blood, using other components like white blood cells. May explained that although extreme exposure to chemicals, such as bleach or ultraviolet light from the sun, can weaken or destroy DNA and make it difficult to detect, such exposure will not alter a DNA profile to look like someone else's profile.

¶ 53        May outlined her testing process and contamination prevention measures, which included wearing protective gear, cleaning her workspace with bleach, and using positive and negative controls. Describing her specific methods, May stated the following:

> "The first step is called extraction. And during that step, I separate the DNA from the item of evidence. The second step is called quantitation. And during that step, I figure out how much DNA I actually have from that evidence sample. The third step is amplification. And during that step, I make many copies of the specific areas of the DNA that I'm interested in ***. And then the fourth step of the process is where I will generate the DNA profile and then interpret the results and make any comparisons in the case."

¶ 54        May further detailed her procedure after she generates a DNA profile, explaining as follows:

> "So, once I have the profile after I've interpreted it—interpretation would involve looking at it to see if it's even suitable to be compared to known reference samples

and then determining how many people might be contributing their DNA to that evidence sample. So, once I've established those factors, if it's even suitable and how many people might be contributing to the item, then I'll compare it to any known reference samples that I have from any individuals related to the case."

¶ 55 May testified she received the cigarette butt recovered from the scene and a known buccal swab reference sample collected from defendant. She performed DNA testing on both items and developed DNA profiles. May explained that because more than one person contributed DNA to the cigarette butt, it contained a "mixture of different DNA signals or patterns together." Specifically, she determined the cigarette butt contained a mixture of DNA from two male contributors.

¶ 56 May compared defendant's known DNA profile to the evidence profile and concluded that defendant "was included as a potential contributor to the mixture of DNA profiles on the cigarette butt." Explaining her specific terminology, May testified, "We don't use phrases like 'match' or 'does not match' anymore. *** '[I]ncluded' means that everything is consistent and nothing is inconsistent." Because defendant was included as a contributor, May calculated the statistical frequency of the mixture to be no more common than 1 in 3.2 billion unrelated individuals.

¶ 57 May then testified that she searched the mixture of DNA profiles from the cigarette butt in the Combined DNA Index System (CODIS), a national database containing profiles from crime scenes, convicted offenders, and missing persons used to aid criminal investigations. She stated that the CODIS search returned an association to Ibarra. Although she did not receive a reference sample from Ibarra to confirm the association, May noted the association was "valid for *** investigative follow up by the agency."

¶ 58	On cross-examination, May acknowledged she cannot determine the specific time frame when DNA was deposited on an item, agreeing it is possible for a mixture to result from two individuals contacting the same item at completely separate times. She reiterated that chemicals, like the bleach she used to clean her workspace, as well as ultraviolet light, can destroy DNA and hinder profile detection.

¶ 59	After the State rested, defendant did not present any evidence.

¶ 60	Following closing arguments, the jury found defendant guilty of first degree murder.

¶ 61	C. Sentencing

¶ 62	In February 2025, the trial court conducted a sentencing hearing. At the onset of the hearing, the court noted it had received a presentence investigation report (PSI) and asked the parties if they had any changes to make. The State noted defendant had a pending murder case but stated it would not present evidence regarding that offense. The court stated it would not consider that case unless evidence concerning it was presented, but none was.

¶ 63	Attached to the PSI were victim impact statements, which the State read into the record. McCammond provided a statement detailing the severe physical and emotional trauma, indescribable fear, and helplessness she endured during the home invasion. Alexia Gonzalez, the victim's daughter, provided a statement recounting the trauma of gathering at the hospital on the morning of the murder. She emphasized that because her family was forced to endure a lifelong punishment of living without her mother, defendant should similarly be punished for the rest of his life.

¶ 64	The PSI showed that defendant had a lengthy criminal history. His adult record included two Class 4 felony convictions in 2015 for domestic battery and aggravated fleeing to

elude, as well as multiple misdemeanor convictions, including a 2014 criminal trespass to a building, a 2013 criminal trespass to a residence, a 2012 theft, and a 2010 Class A domestic battery. Defendant's juvenile record included a 2009 residential burglary, a 2009 possession of cannabis with intent to deliver, a 2006 retail theft, and two counts of criminal defacement of property in 2006.

¶ 65    In mitigation, defense counsel submitted written statements from defendant's family members. Finally, defendant gave a statement in allocution, expressing sorrow for the victim's family but maintaining he was innocent of the murder.

¶ 66    After a brief recess, the trial court issued its sentencing decision. The court stated it fully considered the trial evidence; the PSI; defendant's history, character, and attitude; the arguments and statement in allocution; and all applicable statutory factors in aggravation and mitigation. The court noted that although the State argued no mitigating factors applied, one factor did apply—namely, "that he is a parent and he has children who would be negatively affected by that parent's absence." The court stated that it was "mindful of the fact that there are a number of children who are going to be growing up without their father present."

¶ 67    The trial court then discussed defendant's rehabilitative potential and the nature of the offense, stating as follows:

> "As far as factors—the other factors in mitigation, [defense counsel] didn't point to ones in particular but talked about [defendant] having rehabilitative potential, which is, of course, what factors in mitigation relate to.
>
> Many of the factors in mitigation would relate to things, like if I'm considering probation, whether someone's likely to comply with a term of probation, and that's not an option here. So, specifically, as enumerated, there are

- 14 -

no factors—other factors in mitigation, but I'll talk further about the potential in a little bit.

For factors in aggravation, this is a circumstance where I can consider that the defendant's conduct caused or threatened serious harm, not in terms of to Tammy Gonzalez—that, of course, is part of the murder case—but in terms of the actions that preceded the death of Ms. Gonzalez. Circumstances of bringing Mr. Garcia Fiebrantz to the home and, before that, the home invasion that was taking place where Mr. Ibarra and Ms. McCammond were victims.

Ms. McCammond testified at trial concerning the really horrific nature of this, where you wake up and find masked people in your home beating you, beating your companion, and more. Stealing things from you and that not being enough and getting more people involved because of greed.

Ms. McCammond testified that she was injured. Mr. Ibarra never testified in the case, but some evidence was received concerning that. This was a home invasion, and it certainly can be considered to have caused or threatened serious harm.

The defendant does have a history of prior delinquency or criminal activity. That was laid out by the State in their argument concerning his juvenile history, as well as his adult history, prior involvement with the court system. And that is significant and the Court is considering that, as well as—and this applies in every case—that a sentence is necessary to deter others from committing the same crime. That's certainly true.

This is the second sentencing. It was the third—well, the second trial, but

I've had three trials relating to the facts of this case. It is the second sentencing that I'm participating in.

None of it changes my thought of how senseless it is that somebody wanting what somebody else has and they get together with their friends or associates and break into someone's house to take it by force from somebody else and, when that's not enough, calling to compound the circumstances by getting an alleged drug dealer to come over and steal from him, rob him. And, of course, we know from the trial where things went south.

I do recognize, as [defense counsel] noted, nobody indicates that you were the person that killed Ms. Gonzalez. Nobody. I know that [defense counsel] took issue with it being who Mr. Hawkins said it was, but nobody said that it was you. And that, of course, is a plus.

But you're involved in an unbelievably serious crime with the worst consequence ever: somebody getting murdered as a result. And so, while you are not accused of being the person who pulled the trigger, you are just as responsible as the person who did, which is why we're here.

In terms of your rehabilitative potential, I am sure that your parents love you. ***

But in terms of your potential, you've squandered it. You've had opportunities involved in the court system to go a different direction. It started when you were a juvenile; it continued when you were an adult—opportunities on probation.

And while one of your probation terms indicates that, ultimately, it was

- 16 -

considered successfully discharged, you faced a—and admitted to a petition to revoke your probation, so I'm—maybe that's quibbling, but every probation term I believe that you had was—you faced a petition to revoke your probation. You were sentenced to the Illinois Department of Juvenile Justice and the Illinois Department of Corrections because of noncompliance with the terms and conditions of your probation.

* * *

One of the things that I did in preparation for the sentencing was looking back on your codefendant. As I indicated when we started, his sentence was 65 years in the Department of Corrections. He had a similar criminal history to yours. He had an additional felony conviction. His role in the offense is alleged to be different, but there really are no positives about this offense. There's no spin that you can put on it to say it's not so bad. It's breaking into people's homes, stealing their things, calling in for somebody else, and somebody gets killed. There's nothing good about that."

¶ 68 Ultimately, the trial court sentenced defendant to 57 years in prison.

¶ 69 This appeal followed.

¶ 70                                    II. ANALYSIS

¶ 71 Defendant appeals, arguing that (1) the trial testimony by the State's DNA expert lacked a proper foundation for her conclusion that one of the two male DNA profiles found on a cigarette butt at the crime scene matched defendant's DNA profile, (2) the State's evidence was not sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt, and (3) defendant's 57-year sentence was excessive.

¶ 72    We disagree with all of defendant's claims and affirm.

¶ 73    A. Defendant's Claim That the Testimony Against Him by the State's DNA Expert

Lacked a Proper Foundation for Her Conclusion

¶ 74    In his brief, defendant makes the following argument:

"The State's DNA expert, Heather May, concluded that [defendant] could not be excluded as a contributor to the mixture of DNA profiles found on [the cigarette butt recovered from the crime scene]. However, May did not explain how she conducted the DNA testing, did not state what testing method she used, did not explain what steps she took, did not explain how she came to her conclusion that [defendant] could not be excluded, and did not provide any basis for her statistical calculations. Despite these glaring omissions in her testimony, May's testimony and opinions were admitted at trial."

¶ 75    Defendant concedes that his trial attorney did not object to May's testimony but claims that the admission of her testimony constituted plain error. Alternatively, defendant claims that his trial counsel was ineffective for failing to object to May's testimony on the grounds of lack of foundation.

¶ 76    Because we conclude that May's testimony was properly admitted, we reject all of defendant's contentions.

¶ 77    Defendant relies primarily upon *People v. Safford*, 392 Ill. App. 3d 212 (2009), and *People v. Murray*, 2019 IL 123289, to support his argument. Accordingly, we discuss each of these cases in detail.

¶ 78    1. Safford *Was Wrongly Decided and Will Not Be Followed*

¶ 79    a. A Summary of *Safford*

- 18 -

¶ 80	In *Safford*, the defendant was convicted of aggravated battery with a firearm and attempted murder of a police officer. *Safford*, 392 Ill. App. 3d at 212. He argued on appeal that the trial court committed reversible error when it allowed a fingerprint examiner to testify to his conclusion that a print found on the victim's vehicle belonged to the defendant without providing an evidentiary foundation for his opinion. *Id.* at 212-13. The First District agreed with the defendant's argument, reversed his conviction, and remanded for a new trial. *Id.* at 213.

¶ 81	At trial, the trial court found Brent Cutro, a forensic scientist and latent fingerprint examiner for the Illinois State Police's Joliet, Illinois, laboratory with 24 years of experience, qualified to testify as an expert witness. *Id.* at 220. Cutro testified that he had determined that one latent print found on the lower left corner of the hood of the officer's patrol car matched the inked print of the defendant. *Id.*

¶ 82	The appellate court summarized some of Cutro's testimony, as follows:

> "Mr. Cutro testified his practice is to look at three levels of detail on each fingerprint during his analysis in order to come up with points of comparison. He testified he makes no notes when he finds points of comparison, nor does he record how or why he arrives at his conclusions. He notes only whether a latent print matches a known print. Mr. Cutro never testified to any number of points of comparison that he found between the latent print from the patrol car and the defendant's print. Mr. Cutro acknowledged that during his fingerprint examination he used a magnifying glass." *Id.* at 217.

¶ 83	On cross-examination, Cutro admitted that, during the fingerprint examination, he did not note the points of comparison he found. *Id.* at 220. The appellate court wrote the following about his testimony:

"Examiner Cutro testified he would have observed the points of comparison in examining the Level Two detail. Examiner Cutro is among a group of experts that [*sic*] does not exclusively base his ultimate opinion as to identification on the points of comparison. He testified he made 'matrix notes' in reaching his opinion, but admitted his notes do not explain how he reached his opinion in this case. Examiner Cutro explained that he does not make notes as to his visual examination of the prints he is comparing; he merely notes whether there is or is not an identification." *Id.*

¶ 84 The defendant argued that the trial court erred by allowing Cutro to testify regarding his conclusion that the latent print recovered from the officer's patrol car belonged to the defendant without ever testifying, on either direct or cross-examination, about the evidentiary basis for his opinion. *Id.* The defendant further argued that to allow opinion testimony based solely on the qualifications of the witness as an expert, without disclosing the basis for the opinion, " 'would be to invite forensic fraud.' " *Id.* The appellate court noted that the defendant was attacking Cutro's fingerprint identification testimony that the trial court allowed "as equivalent to allowing [E]xaminer Cutro 'to testify in essence: I am an expert and you have to take my word for it.' " *Id.*

¶ 85 After the appellate court first concluded—erroneously—that the determination of whether the foundational requirements had been met for the admission of an expert opinion presents a question of law that should be reviewed *de novo*, the appellate court was persuaded by the defendant's argument and reversed his conviction. *Id.* at 223.

¶ 86 The third member of the First District panel in *Safford* was Justice Warren D. Wolfson, who dissented. Given that Justice Wolfson was renowned as one of the leading lights of the Illinois judiciary and was considered, in particular, an expert on the rules of evidence, one

would have thought that his dissent would have given the majority pause.

¶ 87    But apparently not.

¶ 88    In Justice Wolfson's dissent, he wrote, in part, the following:

"There is a disquieting paucity of detail to support Examiner Cutro's opinion that the defendant's fingerprint was on the windshield of Officer Marcano's squad car. I believe, however, Cutro's testimony was sufficient, barely, to place his conclusions before the jury. That is, the lack of testimony concerning the number of points of comparison went to the weight of Cutro's opinions, not their admissibility.

Cutro testified at length about the comparison process he uses. In this case, Cutro compared inked print cards containing the defendant's prints with the latent print found on the squad car. The exhibits were admitted into evidence. He uses the 'analysis comparison evaluation and verification method.' It consists of three levels. He does not use a points of comparison test.

In level one, Cutro looks at the flow or pattern type of fingerprint ridges. Then come the magnifying glass comparisons, 'comparing the latent and going from the latent and looking at target individual characteristics or that level two and level three detail that I spoke about, and trying to find those ending ridges or bifurcations in sequence, and see if they match in sequence to the known standards.' The individual characteristics at level two can be ending ridges, bifurcations, and dots. He uses level three if needed. Somewhere between the second and third levels he looks at the breadth or width of the ridges.

Cutro determines whether certain points of comparison are located in

the same place. His notes reflect his conclusions, but not how he reached them. He identified the latent print as that of the defendant on two different occasions. Each time his conclusion was verified by other examiners.

I have no desire to denigrate the importance of cross-examination. However, I find no authority that supports the proposition that the lack of detail we find here is devastating enough to bar a qualified and experienced fingerprint examiner's opinions." *Id.* at 231 (Wolfson, J., dissenting).

¶ 89             b. Decisions Citing—and Rejecting—*Safford*

¶ 90             Since *Safford* was decided in June 2009, no court has cited it approvingly. The only decision that—temporarily—did so was *People v. Jones*, 2015 IL App (1st) 121016, ¶ 2. In that decision, the First District concluded that the trial court erred by admitting expert testimony regarding firearms and toolmarks in which the expert identified the bullet found by the victim as having been fired from the defendant's gun. In *Jones*, the First District reversed the defendant's conviction "because the expert's testimony lacked an adequate foundation where the expert testified that he found 'sufficient agreement' but did not testify to any facts that formed the bases or reasons for this ultimate opinion that the bullet matched [the] defendant's gun." *Id.*

¶ 91             Justice Mary Anne Mason vigorously dissented and instead agreed with the First District's observation in *People v. Negron*, 2012 IL App (1st) 101194, ¶ 41, that *Safford* (upon which the majority in *Jones* relied) was "indeed an 'outlier case' and that 'no reported case since then' has followed its reasoning. I do not believe this case should be the first to do so ***." *Jones*, 2015 IL App (1st) 121016, ¶ 119 (Mason, J., dissenting).

¶ 92             In her scholarly dissent, Justice Mason discussed at length the many flaws present in the *Safford* opinion and appropriately referred to Justice Wolfson's learned dissent in that case.

*Id.* ¶¶ 129-31.

¶ 93    As mentioned earlier, the *Jones* case only temporarily constituted a basis for a decision approving of *Safford* because six months after the First District issued the *Jones* opinion, the Illinois Supreme Court entered the following order in that case:

"This cause coining to be heard on the motion of petitioner, People of the State of Illinois, due notice having been given to respondent, and the court being fully advised in the premises;

IT IS ORDERED that the motion to vacate the present cause *ab initio* due to defendant's death is *allowed*. The Appellate Court, First District, is directed to vacate its judgment in case No; 1-12-1016. The Circuit Court of Cook County is directed to vacate its judgment in case No. 08-CR-19575." *People v. Jones*, No. 119826 (Ill. Oct. 26, 2015) (supervisory order).

We cannot be certain that this action by the Illinois Supreme Court reflects its rejection of the reasoning in *Jones*, as well as the reasoning in *Safford* upon which *Jones* was based; however, given that we cannot recall the Illinois Supreme Court's ever taking similar action in any other case, we view its supervisory order in *Jones* as rather short of an endorsement of the analyses contained in *Jones* and *Safford*.

¶ 94    Seven years after *Safford* was decided, a unanimous panel of the First District rejected the *Safford* analysis regarding expert testimony in *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 123-26. In *Simmons*, Justice David Ellis wrote the following for a unanimous court:

"[W]e decline to follow *Safford*. As this court explained in *Negron*, 2012 IL App (1st) 101194, ¶ 41, '*Safford* is an outlier case,' and no court since *Safford* has required that an expert disclose the specific reasons for his opinion as a

prerequisite to admissibility. Thus, the court in *Negron* found that 'the fact that [the latent fingerprint examiner] did not rest his analysis or ultimate opinion on a specific number of comparison points' simply went to the weight of his opinion that certain fingerprints matched. *Id.* ¶ 42.

And looking to *Safford* itself, we conclude that its analysis was flawed. While the court in *Safford* cited the principle that the information on which an expert bases his opinion must be reliable (*Safford*, 392 Ill. App. 3d at 221), it did not correctly analyze that principle. That principle centers on whether 'the underlying facts or data upon which [the expert] seeks to base an opinion are of a type reasonably relied upon by experts in the particular field.' [*City of Chicago v.*] *Anthony*, 136 Ill. 2d [169,] 186 [(1990)]. But the majority in *Safford* asked a different question—whether the expert sufficiently detailed the reasons for his opinion. The presence or absence of such details is not the same as whether the expert relied on information of a type reasonably relied upon by experts in his field.

In this case, Mayland [(who was the expert whose testimony was at issue in *Simmons*)] testified that he relied on the two bullets' class characteristics and individual characteristics to reach his conclusion. He testified that other firearms and toolmark examiners rely on this information in conducting their analyses. Thus, the State established that Mayland based his opinion on reliable information, *i.e.*, information on which other experts in his field rely. That he did not specify *which* individual characteristics matched on these particular bullets (*i.e.*, the basis of his opinion) simply affected the weight of his

- 24 -

opinion—a question for the jury to resolve, not a question for the court to resolve when deciding whether to admit or exclude Mayland's testimony.

Moreover, we disagree with the court's conclusion in *Safford* that the failure to reveal the basis for an expert opinion necessarily curtails a defendant's right to cross-examine the expert. This case provides an excellent example. Here, defense counsel cross-examined Mayland on his inability to specify which individual characteristics he identified as matching on the two bullets. And she was able to elicit testimony that the Illinois State Police lack objective criteria to guide their firearms comparison, and that the consecutive matching stria method of identification has a more objective, data-driven foundation. Defense counsel then used these points in her closing argument. While Mayland's testimony did not help defendant—defendant would have benefitted most had Mayland's testimony been excluded entirely—his inability to recall which individual characteristics he identified did not preclude defense counsel from ably cross-examining Mayland." (Emphasis in original.) *Id.*

¶ 95    In *People v. Bradford*, 2019 IL App (4th) 170148, this court similarly rejected the aberrational, erroneous decision in *Safford*. Writing for a unanimous court in *Bradford*, Justice Craig DeArmond noted that the defendant argued it was error for his counsel not to object to what the defendant characterized as an "unreliable firearm expert's testimony," due to what the defendant claimed was an inadequate foundation for the expert's testimony. *Id.* ¶ 16. After noting that the defendant cited *Safford* in support of this claim, Justice DeArmond wrote the following:

"As was noted by the State, '*Safford* has been heavily criticized, and characterized as an "outlier." ' *People v. Robinson*, 2018 IL App (1st) 153319,

¶ 19 (citing *People v. Negron*, 2012 IL App (1st) 101194, ¶ 41 \*\*\*, *People v. Wilson*, 2017 IL App (1st) 143183, ¶¶ 41-42 \*\*\*, and *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 120-28 \*\*\*). The *Robinson* court went on to note it was unable to find any published case that followed *Safford*'s reasoning. *Robinson*, 2018 IL App (1st) 153319, ¶ 19. Under Illinois Rule of Evidence 705 (eff. Jan. 1, 2011), an expert 'may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.' Under Rule 705, the burden is on the defense ' "during cross-examination to elicit the facts underlying the expert opinion." ' *Negron*, 2012 IL App (1st) 101194, ¶ 42 (quoting *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981)). The court in *Simmons* continued the criticism of *Safford*, noting the majority's holding ran counter to Rule 705 and a number of Illinois Supreme Court cases concluded that the basis of an expert's opinion is a matter for cross-examination since it goes to the weight to be given the expert's testimony and not its admissibility. *Simmons*, 2016 IL App (1st) 131300, ¶ 121 (' "[T]he basis for a witness' opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence \*\*\*." ' (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 26 (2003)))." *Id.*

¶ 96 For the reasons explained by Justice DeArmond, this court in *Bradford* rejected all of the defendant's arguments and concluded that there was a sufficient foundation for the expert's testimony, which precluded the defendant's counsel from objecting; accordingly, there was no

deficient performance. *Id.* ¶ 17.

¶ 97                                    c. This Case

¶ 98        Despite the consistent, universal rejection by the appellate court of the aberrational, erroneous decision of the First District in *Safford*, defendant's primary claim in this case is that the State's DNA expert's testimony should not have been admitted, based on the flawed *Safford* analysis. Citing *Safford*, defendant contends that Heather May, when she testified, failed to discuss her methodology or provide a scientific basis for her opinion that one of the two male DNA profiles found on the cigarette butt matched defendant's DNA profile.

¶ 99        In making this argument, defendant fails to acknowledge any of the analysis contained in the appellate court decisions subsequent to *Safford* that we just discussed, all of which explicitly rejected *Safford*'s analysis and conclusion.

¶ 100        We earlier set forth in detail the testimony of Heather May, the State's DNA expert, who testified regarding her conclusion that the DNA found on the cigarette butt she tested matched the DNA of defendant. We need not repeat that testimony here but instead will simply note that (1) in our judgment, the foundation the State elicited from May for her conclusion as an expert witness was clearly adequate; (2) because the expert's testimony was appropriately admitted, defendant's trial counsel's "failure to object" did not constitute ineffective assistance of counsel; and (3) we join with our appellate court colleagues in yet again rejecting *Safford* and deeming that case aberrational and wrongly decided.

¶ 101                              d. The Epilogue for *Safford*

¶ 102        Every so often, Illinois courts are confronted with arguments that, despite being repeatedly rejected, continue to be made. An example is the argument defendant makes in this case—namely, that the repeatedly discredited case of *Safford* requires more detail from the expert

witness about her methods and procedures before her testimony could be admitted.

¶ 103 One example of an appellate court dealing with such an argument occurred in *People v. Rodgers*, 264 Ill. App. 3d 740, 742 (1992), in which the defendant was convicted of various felonies. On appeal, the defendant argued, in part, that the trial court erred by allowing testimony of extra-indictment offenses into evidence. *Id.* at 747. The appellate court rejected this argument for the following reason: "Statements made by a defendant which illustrate, explain, or interpret by way of collateral criminal acts, which are interwoven with the criminal transaction for which the defendant is being tried, are admissible as a part of the *res gestae* of the underlying criminal transaction." *Id.*

¶ 104 Justice Allen Greiman wrote a brilliant special concurrence regarding the majority opinion's use of the discredited doctrine *res gestae*, as follows:

> "Like an entombed vampire, every now and again 'Count *Res Gestae*' moves the cover of his coffin and begins to circulate in the world of litigators and judges, promising them that they no longer must provide rational analysis or appropriate explanations for exceptions to the hearsay rule. Instead, they need only mutter '*res gestae*' to cover a multitude of sins." *Id.* at 752 (Greiman, P.J., specially concurring).

¶ 105 Justice Greiman then went on to describe how the concept of *res gestae* has been universally criticized for decades and had been rejected by the Illinois Supreme Court 30 years earlier. *Id.* at 752-53. Justice Greiman concluded his special concurrence with the following:

> "Despite decades of uniform criticism of the use of *res gestae*, the majority has elected to let the *res gestae* vampire out of its coffin.
>
> I would hope that this concurring opinion can be the equivalent of a

stake in the heart of *res gestae* and that the coffin lid may be securely fastened."
*Id.* at 753.

¶ 106     Almost 30 years later, this court had its own version of a dead legal doctrine escaping its coffin to haunt legal procedures. In *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 42, the defendant was convicted of unlawful use of weapons (UUW), based upon an accountability theory, and argued that for the common-design rule to apply (upon which the State premised its case), the State must prove that the defendant attached himself to a group intent on committing *some specific* offense. Accordingly, the defendant argued that he could not be convicted of UUW if the group he joined did not intend to commit that specific offense. *Id.*

¶ 107     This court rejected the defendant's claim and wrote the following:

> "As the supreme court explained in [*People v. Fernandez*, 2014 IL 115527, ¶ 21], whether a defendant had the intent to commit some specific crime is the focus in shared-intent cases, not common-design cases, like the case now before us. *Id.* Shared-intent cases have nothing to do with common-design cases because they are analytically separate. *Id.*
>
> All members of the group in common-design cases who are bent on illegal acts are equally responsible for '*any acts* in the furtherance of that common design.' *Id.* ¶ 13." (Emphasis in original.) *Id.* ¶¶ 44-45.

¶ 108     After so concluding, this court added an epilogue, in which we pointed out the many courts that had rejected the very argument that the defendant raised in *Jackson* (including the Illinois Supreme Court) and reiterated what we wrote in *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 54, as follows:

> " 'The shared-intent requirement of the common-design rule is as

- 29 -

resilient as it is unsound. Its ability to maintain a foothold in Illinois jurisprudence despite 160 years of rejection by the supreme court reminds us of the defunct evidentiary doctrine of *res gestae*. Justice Greiman drew the appropriate analogy:

"Like an entombed vampire, every now and again 'Count *Res Gestae*' moves the cover of his coffin and begins to circulate in the world of litigators and judges ***. ***

* * *

I would hope that this concurring opinion can be the equivalent of a stake in the heart of *res gestae* and that the coffin lid may be securely fastened." [Citation.]

Like *res gestae*, the shared-intent requirement of the common-design rule has shown an uncanny ability to come back from the dead. Even though the past 160 years of supreme court precedent have failed to decisively kill the bogus shared-intent requirement of the common-design rule, we are hopeful that *Fernandez* has finally finished the job. We hope that this opinion will serve as an additional nail in the coffin.' [Citations.]

As shown by the arguments in this case, our hopes have been dashed that the shared-intent requirement of the common-design rule has been killed. To quote Miracle Max from '*The Princess Bride*,' it appears that the shared-intent requirement is 'only mostly dead.' Accordingly, in an effort to avoid a zombie apocalypse of the undead, we hope that this latest opinion of ours might be the equivalent of cutting off the head of the shared-intent requirement, riddling its

body with silver bullets, stuffing its mouth with garlic, and burying it in a lead-lined coffin in hallowed ground." *Jackson*, 2020 IL App (4th) 170036, ¶¶ 68-69 (quoting *Phillips*, 2014 IL App (4th) 120695, ¶ 54, quoting *People v. Rogers*, 264 Ill. App. 3d 740, 752-53 (1992) (Greiman, P.J., specially concurring)).

¶ 109    Based on defendant's argument in the present case, it appears once again that Miracle Max was right: the discredited doctrine from *Safford* upon which defendant relies is "only mostly dead." So, to repeat what we wrote in *Jackson*, we hope that this latest opinion of ours might be the equivalent of cutting off the head of the *Safford* doctrine, riddling its body with silver bullets, stuffing its mouth with garlic, and burying it in a lead-lined coffin in hallowed ground.

¶ 110                                  2. Murray

¶ 111    The second case upon which defendant relies in support of his claim that the trial court improperly admitted May's expert testimony is *Murray*. In that case, the defendant was convicted of first degree murder and unlawful possession of a firearm by a street gang member. *Murray*, 2019 IL 123289, ¶ 1. On appeal, the defendant argued only that the evidence was insufficient to establish that he committed the firearm offense. *Id.* The supreme court agreed and reversed the defendant's gang-related criminal offense, concluding that the State failed to prove that the Latin Kings (the gang at issue) was a "street gang," as defined by Illinois statute. *Id.* ¶ 53. In so concluding, the supreme court noted that the State's expert witness regarding street gangs, David Dammon, did not disclose the specific crime evidence required by the Illinois Streetgang Terrorism Omnibus Prevention Act (740 ILCS 147/1 *et seq.* (West 2012)) to support his opinion that the Latin Kings was a street gang. *Id.* ¶ 29.

¶ 112    After reaching this conclusion, then-Justice P. Scott Neville Jr., now Chief Justice Neville, wrote the following:

"In addition, we observe that Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) unambiguously requires that Dammon articulate the reasons for his opinion. Rule 705 provides that '[t]he expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data.' *Id.* Here, Dammon generally described in broad terms the types of information and facts on which his opinion was based, but he never explained his reasons as to why that information supported his opinion. Admittedly, Dammon was not obligated to bring forth the underlying facts and data upon which his opinion was premised, but merely identifying the source of those facts and data, without explaining the reasons for his opinion, fails to prove the elements of the offense of unlawful possession of a firearm by a street gang member." *Id.* ¶ 31.

¶ 113    Based upon *Murray* and *Safford* (the First District opinion we just discussed), defendant claims that May's expert testimony was not admissible because she

"did not explain the makeup of DNA, did not explain how she conducted the DNA testing, did not state what testing method she used to obtain [the defendant's] DNA profile, did not explain what DNA markers are used for comparing profiles, much less describe what parts of [defendant's] DNA profile she analyzed or how she determined that [defendant's] profile was 'consistent' with the mixture found on the cigarette."

Defendant also contends that, contrary to the requirements of *Murray*, "the State did not meet the first condition for the admissibility of expert evidence because it failed to provide reasons for the expert's opinions."

¶ 114　　　　In defendant's reply brief, he mentions how the State argued that "an expert may give an opinion without disclosing the facts underlying the opinion," citing *Wilson*, 84 Ill. 2d at 194, but then argues as follows:

> "Notably, all of the State's supporting cases pre-date the Supreme Court's most recent decision regarding the admission of expert evidence under Rule 705, *People v. Murray*, 2019 IL 123289, which specifically held that Rule 705 'unambiguously requires that [an expert] articulate the reasons for his opinion.' *Murray*, 2019 IL 123289, ¶ 31."

¶ 115　　　　The primary problem with the argument defendant makes regarding *Murray* is that the language defendant cites in *Murray* is *not* the opinion of the Illinois Supreme Court; instead, it is the plurality opinion of two of the seven justices from that court.

¶ 116　　　　To be more specific, the language from *Murray* upon which defendant relies— namely, that "Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) unambiguously requires that Dammon articulate the reasons for his opinion" (*Murray*, 2019 IL 123289, ¶ 31)—was written by then-Justice Neville for the majority in that case. However, regarding specifically his reference to Rule 705, what Justice Neville wrote constituted a plurality opinion. That is because only Justice Anne Burke concurred in what Justice Neville wrote.

¶ 117　　　　Justice Thomas Kilbride specially concurred, with an opinion, joined by then-Chief Justice Lloyd Karmeier. Justice Rita Garman dissented, with opinion, joined by Justices Robert Thomas and Mary Jane Theis.

¶ 118　　　　The *very first* paragraph of Justice Kilbride's specially concurring opinion makes it clear that he (and then-Chief Justice Karmeier) explicitly disagreed with Justice Neville's reference to Rule 705, where Justice Kilbride wrote the following:

"I agree with the result and most of the majority's analysis, but I do not join its discussion of Illinois Rule of Evidence 705 (eff. Jan. 1, 2011), concluding that the rule 'unambiguously requires that [Detective] Dammon articulate the reasons for his opinion.' See *supra* ¶ 31. That discussion creates unnecessary tension between this decision and our long-standing rule in *Wilson v. Clark*, 84 Ill. 2d 186 (1981). I believe the State's failure to establish a *prima facie* case on the count charging defendant with the unlawful possession of a firearm as a street gang member negates any need to address either Rule 705 or *Wilson*.

In *Wilson*, we adopted Federal Rules of Evidence 703 and 705 and, as our subsequent case law explains, declared

'that, at trial, "an expert may give an opinion without disclosing the facts underlying that opinion." *Wilson*, 84 Ill. 2d at 194. "Under Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion." *Wilson*, 84 Ill. 2d at 194. Thus, an expert testifying at trial may offer an opinion based on facts not in evidence, and the expert is not required on direct examination to disclose the facts underlying the expert's opinion. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 334 (2002).' *People v. Williams*, 238 Ill. 2d 125, 137 (2010), *aff'd*, 567 U.S. 50 (2012).

In contrast, the majority here [(that is, Justices Neville and Burke)] concludes that Rule 705 'unambiguously requires' experts to explain the reasons underlying their opinions, creating tension with our long-standing statements in *Wilson* and its

- 34 -

progeny, but does not harmonize the two views." *Id.* ¶¶ 57-58 (Kilbride, J., specially concurring).

¶ 119    Justice Garman, in dissent, explicitly and strongly disagreed at length with the plurality opinion written by Justice Neville that "Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) unambiguously requires that Dammon articulate the reasons for his opinion." *Id.* ¶ 80 (Garman, J., dissenting). For our purposes, we need not go into detail about why Justice Garman believed Justice Neville's plurality opinion was inconsistent with the Illinois Supreme Court's earlier decision in *Wilson* and its progeny, because the reasons for her disagreement do not matter.

¶ 120    What matters is that Justices Thomas and Theis joined in Justice Garman's dissent, which means that Justices Garman, Thomas, and Theis, as well as Justices Kilbride and Karmeier explicitly *disagreed* with Justice Neville's statement regarding Rule 705 and the burden that rule places upon the proponent of expert testimony.

¶ 121    We stress the following point: the language repeatedly emphasized by defendant and primarily relied upon in his briefs to this court as being the language of the Illinois Supreme Court is *in fact* language adopted by only two of the seven justices of the Illinois Supreme Court. To make matters worse, it is not as if the other five members of the supreme court ignored this issue or chose not to comment upon it; instead, they all *explicitly* rejected the language from Justice Neville's plurality opinion, upon which defendant relies.

¶ 122    We counted the number of times in defendant's brief and reply brief that he referred to the Illinois Supreme Court's decision in *Murray*. In defendant's initial brief, he devoted four and a half pages to a discussion of *Murray* and its claimed application to the present case. In doing so, defendant cited *Murray* 14 separate times. In defendant's reply brief, he devoted the better part of eight pages to a discussion of *Murray* and cited it 16 times.

¶ 123 In none of defendant's citations or references to *Murray* did he mention that the language he cited and relied upon is from a plurality opinion representing the views of only two of the seven justices from the Illinois Supreme Court. In this regard, it is interesting to note that the 21 headnotes West Publishing Company has provided for the Northeastern Reporter and Illinois Decisions regarding *Murray* all conclude with the following language: "(Per Neville, J., with one justice concurring in judgment and opinion and two justices specially concurring.)."

¶ 124 The *best* we can say about defendant's argument to this court regarding *Murray* is that it is misleading and disingenuous.

¶ 125 Having now pointed out that defendant's argument based upon the plurality language from *Murray* has collapsed like a house of cards, we need not further lengthen this opinion by explaining why we reject defendant's arguments regarding May's expert testimony. We repeat what we concluded earlier: (1) May's testimony was properly admitted and (2) any claim that defendant's trial counsel was ineffective for not objecting to that testimony is completely groundless.

¶ 126 B. Defendant's Claim that the State's Evidence Was Not Sufficient To Prove Him

Guilty Beyond a Reasonable Doubt

¶ 127 Defendant next argues that the State failed to prove him guilty of first degree murder beyond a reasonable doubt because (1) the DNA evidence presented at his trial did not establish that he was present at the scene of this offense and (2) the State's only remaining evidence was the unreliable and self-serving testimony of a coconspirator who testified in exchange for complete immunity.

¶ 128 We strongly disagree.

¶ 129 1. *The Applicable Law and the Standard of Review*

¶ 130　　　"When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, our function is not to retry the defendant." *People v. Johnson*, 2026 IL 131337, ¶ 59. Instead, "[w]hen a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 131　　　　　　　　　　　　　2. *This Case*

¶ 132　　　Defendant's argument that the State's evidence was not sufficient to prove him guilty beyond a reasonable doubt rests upon two premises: (1) "pursuant to *People v. Murray*, 2019 IL 123289, the State's DNA expert's testimony did not establish that DNA found at the scene of the offense matched [defendant]" and (2) "the State's only other evidence was the incredible testimony of a co-conspirator [(Hawkins)] who testified in exchange for total immunity in this case."

¶ 133　　　We emphatically reject both of defendant's claims and his ultimate conclusion that the State's evidence was not sufficient to prove him guilty beyond a reasonable doubt.

¶ 134　　　Regarding defendant's reliance on *Murray*, we have already discussed at length why that reliance is utterly meritless. See *supra* ¶¶ 112-26. We need not repeat that analysis here.

Instead, we will simply note that the expert testimony of Heather May regarding DNA was properly admitted and strongly incriminated defendant.

¶ 135 Regarding Hawkins, we note that he testified at length at defendant's jury trial and was subjected to cross-examination. The jury heard Hawkins admit his detailed involvement in these crimes and that he had received full immunity regarding them in exchange for his testimony.

¶ 136 Defendant contends that the testimony of Hawkins was unworthy of belief, but we note again that the weight to be given to the testimony of a witness and the determination of his credibility are the responsibility of the trier of fact—in this case, the jury. Essentially, defendant is asking this court to second-guess the jury and not accept its determination of Hawkins's credibility. We reject this inappropriate invitation.

¶ 137 Considering this record as a whole, we conclude that defendant's claim that the State's evidence was not sufficient to prove him guilty beyond a reasonable doubt is completely without merit.

¶ 138 C. Defendant's Claim That His Sentence Was Excessive

¶ 139 Last, defendant argues that his 57-year prison sentence was an abuse of discretion. Specifically, he asserts that the trial court failed to properly consider evidence in mitigation and the objective of restoring him to useful citizenship.

¶ 140 As an initial matter, defendant concedes that he forfeited these claims of error by failing to properly preserve them in the trial court. See *In re M.P.*, 2020 IL App (4th) 190814, ¶ 44 ("A defendant forfeits an issue for purposes of appellate review by failing to object to the alleged error or raise it in a written posttrial motion."). Nonetheless, he contends that we may review his claims as first-prong and second-prong plain error.

¶ 141	In the alternative, defendant argues that his sentencing counsel provided ineffective assistance by failing to file a motion to reconsider based on the alleged errors.

¶ 142	We disagree and reject all of defendant's claims.

¶ 143	1. *The Applicable Law and the Standard of Review*

¶ 144	a. Sentencing Generally

¶ 145	A statutorily authorized sentence is presumptively proper, and we may not disturb a trial court's evaluation of proper factors absent an abuse of discretion. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56. "A trial court's sentence is an abuse of discretion if it is greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.*

¶ 146	"The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "It is also required to consider statutory factors in mitigation and aggravation; however, 'the court need not recite and assign a value to each factor it has considered.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19 (quoting *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38). We presume that a sentencing court considered all relevant factors, including factors in mitigation. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43.

¶ 147	Defendant bears the burden of showing that the trial court failed to consider mitigating evidence by pointing to explicit evidence in the record. *Id.*

¶ 148	b. The Plain-Error Doctrine

¶ 149	The plain-error doctrine permits a reviewing court to consider claims of unpreserved error under the following two scenarios:

"(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 150     The usual first step in a plain-error analysis is to determine whether a clear and obvious error occurred. *People v. Johnson*, 2024 IL 130191, ¶ 44. "That is true because if there is no error, then there can be no plain error." *People v. Maury*, 2025 IL App (4th) 220887, ¶ 93. "However, similar to the analytical framework we use to review a claim of ineffective assistance of counsel [citation], the first step of plain-error analysis is merely a matter of convention," and we may begin the analysis in any order. (Internal quotation marks omitted.) *People v. Bowens*, 407 Ill. App. 3d 1094, 1108 (2011). If either prong of the plain-error doctrine is not met, then a defendant's plain-error claim fails. *Id.*

¶ 151                    c. Ineffective Assistance of Counsel

¶ 152     A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29.

"Under the *Strickland* standard, to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his attorney's representation fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *People v. Torres*, 2024 IL 129289, ¶ 27.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 87.

¶ 153     "A defendant's failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *Torres*, 2024 IL 129289, ¶ 27.

¶ 154                                    2. *This Case*

¶ 155     Defendant argues that his 57-year sentence is excessive and amounts to a *de facto* life sentence. He contends the trial court failed to adequately consider his rehabilitative potential, his relatively nonviolent criminal history, and the impact his incarceration will have on his seven children. In addition, much of his argument boils down to a claim that a first degree murder conviction based on an accountability theory necessarily warrants a lesser sentence, emphasizing his lack of participation in the actual shooting.

¶ 156     Regarding defendant's accountability argument, the legislature established a sentencing range for first degree murder, applicable both to the principal and to any party guilty by way of accountability. Although defendant did not personally pull the trigger, the death of an innocent victim was a clearly foreseeable consequence of the armed home invasion and robbery he helped execute. We also note that the trial court imposed a prison sentence upon defendant seven years shorter than the principal and significantly below the maximum he could have received.

¶ 157     Moreover, the evidence at trial established defendant was a dangerous criminal willing to break into an occupied home at night while armed with a handgun to execute a robbery. Driven by greed, defendant actively participated in a shockingly violent home invasion, which this court in another case has termed a "modern urban nightmare." See *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 45 ("Some crimes are so abhorrent that the defendant who committed them

forever forfeits his right to walk among civilized society as a free man. No person should ever have to suffer the modern urban nightmare that" the victim in that case endured.).

¶ 158     During the early morning hours, defendant and his accomplices held the victims at gunpoint in their own home, beat them with firearms, threatened rape, and stole possessions ranging from personal trinkets to expensive electronics. Not satisfied with the initial proceeds of their crime, defendant and the other intruders detained the victims even longer and threatened to beat Ibarra further, and defendant personally sexually assaulted Ibarra by shoving an object into his rectum. Defendant then actively participated in disposing of the stolen items and weapons to cover up the crimes.

¶ 159     Even when speaking in allocution, defendant refused to accept responsibility for how his actions contributed to the death of Gonzalez or the trauma inflicted upon both Ibarra and McCammond.

¶ 160     The record reflects that the sentencing court appropriately considered all mitigating and aggravating factors. When mitigating evidence is before the court, it is presumed that the sentencing judge considered it unless there is some indication to the contrary. *People v. Sawyer*, 139 Ill. App. 3d 383 (1985). The trial court explicitly stated it considered the trial evidence, the PSI, defendant's history, and the statutory factors. The court's statement that only one factor in mitigation applied simply indicates that the court believed only that particular factor weighed in favor of a lower sentence, not that it ignored other allegedly mitigating evidence as a whole. Defendant does not persuade us that his strained reading of the court's statement shows that the court failed to consider the mitigating evidence.

¶ 161     The trial court carefully and appropriately explained its consideration of the evidence and its reasoning underlying defendant's sentence. While noting the seriousness of the

offense, the court also noted that defendant did not personally shoot the victim. And the court specifically addressed (1) the impact the sentence would have on defendant's family and (2) defendant's rehabilitative potential.

¶ 162    Essentially, all of defendant's arguments are nothing more than a request for this court to reweigh the evidence and substitute our judgment for that of the trial court. We decline to do so. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 37. A reviewing court must give substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position than this court to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age. *People v. Snyder*, 2011 IL 111382, ¶ 36. The defendant bears the burden to affirmatively establish either that (1) the sentence was based on improper considerations or (2) the trial court failed to consider certain evidence. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. In this case, defendant has completely failed to meet that burden.

¶ 163    Accordingly, because the trial court committed no error when sentencing defendant, there is no plain error. Likewise, because there was no error, trial counsel's decision not to challenge defendant's sentence in a motion to reconsider cannot be a basis for a claim of ineffectiveness of counsel.

¶ 164                                   III. CONCLUSION

¶ 165    For the reasons stated, we affirm the trial court's judgment.

¶ 166    Affirmed.

- 43 -

*People v. Taylor*, 2026 IL App (4th) 250295

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 21-CF-961; the Hon. Debra D. Schafer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Melinda Grace Palacio, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |